UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

ROBERT J. QUINN, JR.,

                Plaintiff,

         v.

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

             Defendant.

_____

**DECISION AND ORDER**

1:15-CV-723 EAW

## I.    Introduction

Plaintiff Robert J. Quinn, Jr. ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and seeks review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's application for disability benefits. (Dkt. 1). Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") Daniel T. McDougall is not supported by substantial evidence and is contrary to law and regulation. (Dkt. 1).

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Fed. R. Civ. P. Rule 12(c). (Dkt. 9; Dkt. 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is not supported by substantial evidence in the record and is not in accordance with the applicable legal standards. Thus, Plaintiff's motion for judgment on the pleadings (Dkt. 9) is granted, in part, and the Commissioner's motion for judgment on the pleadings (Dkt. 11) is denied.

## II.      Factual Background and Procedural History

### A.      Overview

On June 6, 2012, Plaintiff protectively filed an application for disability insurance benefits.   (Administrative Transcript   (hereinafter "Tr.") 149).   Plaintiff alleged a disability onset date of June 25, 2011.  (Tr. 151).  In his application, Plaintiff alleged the following disabilities: tendons totally retracted in the inoperable shoulder, inoperable retracted subscapularis of the tendon, inoperable intraarticular bicep tendon, herniated disc, and back problems.  (Tr. 191).  The Commissioner denied Plaintiff's application on October 11, 2012 (Tr. 99-106), and Plaintiff requested a hearing by an ALJ on November 12, 2012.  (Tr. 107-108).   On December 13, 2013, Plaintiff, represented by counsel, testified at a hearing in Buffalo, New York before ALJ McDougall.  (Tr. 50-87).   On February 25, 2014, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 35-49).

Plaintiff requested review of that decision  (Tr. 33-34) and on June 15, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On August 13, 2015, Plaintiff filed this action appealing the final decision of the Commissioner.  (Dkt. 1).

### B.      The Non-Medical Evidence

#### 1.      General

At the time of Plaintiff's alleged disability onset date, he was 49 years old and at the time of the administrative hearing, Plaintiff was 52 years old.  (Tr. 149).  He had a

general education degree (GED) and had previously worked as a carpenter and as a firefighter. (Tr. 182, 192).

Plaintiff completed a function report on August 16, 2012, in relation to his disability application. (Tr. 171-81). He stated that he tried to feed and walk his pet (Tr. 172), but that he could not do housework because most work required use of his right arm (Tr. 174). He went outside daily either by walking or riding in a car but needed a driver due to his shoulder pain. (Tr. 174-75). He spent time socializing with others on a daily basis and went to church, sporting events, and fundraisers on a weekly basis, though he needed a driver to get around. (Tr. 174; Tr. 176). He had no problems getting along with others and he reported being able to follow instructions, did not have memory problems, and did not have problems getting along with people in positions of authority (Tr. 178-79).

### 2.      Plaintiff's Testimony

Plaintiff appeared at the administrative hearing before ALJ McDougall on December 13, 2013, represented by counsel. (Tr. 50-87). Plaintiff could not raise his hand very high to take the oath. (Tr. 56). Plaintiff testified that he injured his right shoulder in June 2011. (Tr. 56-57). He had had surgery, but surgery was not able to fully correct the damage because they were unable to retrieve the subscapularis or intraarticulating tendon. (Tr. 57). His doctor also removed "basically" half of his clavicle. (Tr. 57). He obtained a second opinion and was told that his next surgery will be full shoulder replacement, but that he is currently too young, as shoulder replacements do not last very long. (Tr. 59). He testified that he would have to wait until "it gets to a

point where [he] can't take it anymore." (Tr. 59). He attended about one year of physical therapy but stopped going after his employer stopped authorizing it because he was not getting better. (Tr. 58). Plaintiff also complained of 25-percent disability in his back after an injury that "destroyed a couple of [his] disks." (Tr. 61). Both injuries were in relation to his job as a firefighter. (Tr. 57; Tr. 61). He additionally testified to tingling in his right hand and that he was dropping things such as car keys, empty glasses, and cups more frequently. (Tr. 69-70).

As a result of his shoulder and back injuries, Plaintiff had difficulty sleeping, walking, driving a vehicle, brushing his teeth, drying his body, and putting on socks and shoes. (Tr. 63). He stated that he is "pretty miserable" most of the time and that "it's difficult to take care of [him]self." (Tr. 63; Tr. 71). He attempts to cook, clean, and do the dishes, but it is painful. (Tr. 64). He stated that his left arm is "getting so bad now" that it is causing pain in his left shoulder as well due to overuse. (Tr. 64-65). As to standing and walking, Plaintiff testified that he struggles with getting out of a chair and that he can walk a block and a half to two blocks or about ten minutes. (Tr. 65). He also said that he has to sit in a way such that he leans left in order to avoid putting pressure on his right arm, but that in turn is affecting his lower back pain because it causes him to have poor posture. (Tr. 65-66). He further said that he can sit for about 15-20 minutes before he has to get up and move. (T. 66). In relation to raising his arm, he could not "get it over chest level." (Tr. 72).

He took Ibuprofen and Hydrocodone for his shoulder pain daily, as needed, though he stated that he tries not to use them too much because he is "scared." (Tr. 67-68). The

side effects of these medications included drowsiness, dizziness, and constipation. (Tr. 67). Plaintiff also took Sertraline for anxiety resulting from the then-two and a half year disability application process. (Tr. 68). All of these medications were prescribed by his primary physician, Dr. Matala. (Tr. 67-68). He had not seen any medical professionals for his anxiety but talked with people he worked with and those in the union. (Tr. 68-69). He had not suffered from any panic attacks. (Tr. 69).

### 3.      Vocational Expert's Testimony

Joe Pearson, an impartial vocational expert, also testified at the hearing. (Tr. 74-87). Mr. Pearson testified that Plaintiff had past relevant work in a skilled, medium-duty exertional level as a carpenter, DOT number 860.381-022 and skilled, very heavy exertional level as a firefighter, DOT number 373.364-010. (Tr. 75-76). The ALJ asked the vocational expert to consider a hypothetical individual of the same age, education, and work experience as Plaintiff, limited to light work who would also needed a sit/stand option for a brief period at least every half hour. (Tr. 76). This hypothetical person would be limited to no more than occasional gross motor movements with the right shoulder, including no work overhead on the right, no more than occasional use of the right hand above the chest level, and no reaching out front more than 18 inches on the right. (Tr. 77). The vocational expert testified that such an individual would be able to perform the unskilled, light jobs of usher, DOT No. 344.677-014, furniture rental consultant, DOT No. 295.357.018, and order caller, DOT No. 209.667-014. (Tr. 79-80).

C.      **Summary of the Medical Evidence**

1.      **Medical Evidence During the Relevant Period**

Plaintiff visited Excelsior Orthopaedics ("Excelsior") on July 21, 2011, for right shoulder pain. (Tr. 250). Plaintiff reported that he developed pain when he popped his right shoulder while pulling on a hose reel as a fireman. (Tr. 250). He had visited Excelsior previously on June 27, 2011, with a potential shoulder impingement. (Tr. 250). On the June visit, Plaintiff self-assessed his current pain level as three out of ten. (Tr. 250). He had soreness at rest, and pain, occasionally shooting, with activity. (Tr. 250). Subacromial injection helped temporarily. (Tr. 250). Dr. Peter Shields diagnosed impingement syndrome of the right shoulder with probable small tear in the rotator cuff. (Tr. 252).

During an August 30, 2011 follow-up visit with Dr. Shields, Plaintiff complained of constant soreness and pain on certain movements with his right arm. (Tr. 256). Pain awakened him at night. (Tr. 256). Plaintiff had been attending physical therapy, which provided slight improvement to his range of motion. (Tr. 256). Dr. Shields reviewed the results of an August 24, 2011 magnetic resonance imaging (MRI), which demonstrated a full thickness tear of the supraspinatus and infraspinatus tendons with a retraction of 3.4 cm with the full thickness tear extending into the subscapularis tendon. (Tr. 258). There was superior migration of the humeral head relative to the glenoid and secondary to the retracted rotator cuff tear. (Tr. 258). There were some small cysts in the lateral aspect of the humeral head. (Tr. 258). There was a rupture of the long-head of the biceps tendon with an empty bicipital grove. (Tr. 258). There was a small tear in the superior glenoid

labrum and he had AC joint arthritis with undersurface osteophytes and type II acromium. (Tr. 258). Dr. Shields noted that Plaintiff's plan was for arthroscopic surgery of the right shoulder. (Tr. 258-59). Dr. Shields opined that Plaintiff could not return to his prior work as a firefighter in the condition he was in at that time and that he was fully disabled. (Tr. 258-59).

Plaintiff underwent right shoulder surgery on September 21, 2011. (Tr. 270-72). Dr. Shields performed an arthroscopic labral debridement, subacromial decompression, excising of the distal clavicle and mini open rotator cuff repair of the right shoulder. (Tr. 270). Two days after the surgery, Plaintiff returned to Dr. Shields for post-surgical evaluation. (Tr. 247-49). Dr. Shields recommended that Plaintiff wear a sling for two to four weeks, start pendulum exercises, and try weaning off pain medications over time. (Tr. 249). Dr. Shields opined that Plaintiff was fully disabled. (Tr. 249).

Plaintiff followed up with Dr. Shields on September 23, 2011. (Tr. 247). Dr. Shields revealed to Plaintiff the massive extent of his rotator cuff tear and the amount of bone removed from the distal clavicle and the undersurface of the acromion and the labral tearing. (Tr. 248). Dr. Shields opined that Plaintiff was fully disabled. (Tr. 249). Plaintiff followed up with Dr. Shields again on December 2, 2011, and at that time still had pain and waking during the night. (Tr. 260). He had been going to physical therapy three times a week and wanted to return to work as a fireman. (Tr. 260). Plaintiff was feeling weak status post his "massive" rotator cuff repair. (Tr. 262). Dr. Shields advised Plaintiff it would be a minimum of six months before Plaintiff would be able to return to

work, if at all.  Dr. Shields found Plaintiff at that time disabled from his normal work. (Tr. 262).

On February 2, 2012, Plaintiff followed-up with Dr. Shields for a four and a half month post-surgical visit.  (Tr. 281-83).  Plaintiff reported making very slow progress, and that he had constant pain that was about three or four out of ten.  (Tr. 281).  Physical examination of the right shoulder demonstrated no specific point tenderness, no obvious effusion, and well healed incisions.  (Tr. 282).  Active range of motion of the shoulder was about 75-80 degrees of forward flexion, 50 degrees of abduction; extension was to 20 degrees and external rotation to between 15-20 degrees.  (Tr. 282).  Plaintiff demonstrated a much better passive range of motion although he had a painful arc of motion.  (Tr. 282).  Dr. Shields also reviewed Plaintiff's December 2011 physical therapy notes, which indicated that Plaintiff was making significant subjective and objective improvement but that active range of motion was problematic.  (Tr. 283).  Plaintiff's goal was to get back to full duty work as a fireman, but was unable to do so at that time.  (Tr. 283).  Plaintiff felt that he could not do desk work because sitting was uncomfortable. (Tr. 283).  Dr. Shields stated he would keep Plaintiff out of work for the present time. (Tr. 283).

A March 8, 2012 MRI of the right shoulder revealed postsurgical changes from acromioplasty, distal clavicular resection and rotator cuff repair; mid proximal supraspinatus plaque-like STIR signal from a suspected scar filled tear; and a chronic retracted tear of the subscapularis and intraarticular biceps tendon.  (Tr. 230-31).

Plaintiff returned to Dr. Shields on March 15, 2012, for his six-month post-surgical appointment. (Tr. 232-34). Dr. Shields stated that Plaintiff had good progress with range of motion overhead but he recently had loss of motion. (Tr. 232). Plaintiff reported marginal improvement, that his range of motion was slowly improving with time, and that his pain was 30-40% better than it was preoperatively. (Tr. 232). Physical exam demonstrated some mild point tenderness over the anterolateral corner of the acromion. (Tr. 233). Active range of motion was about 85 degrees of forward flexion, 60 degrees of abduction, 20 degrees of extension; external rotation was about 30-35 degrees. (Tr. 233). Plaintiff had reasonably good control with rotation and strength without pain. (Tr. 233). He had 5-/5 resisted elbow flexion and forearm supination to the long head of the biceps tendon with some slight discomfort around the bicipital groove. (Tr. 233). Dr. Shield's diagnosis was a rotator cuff tear. (Tr. 234). Dr. Shields referred Plaintiff to his colleague Dr. Jim Slough for a second opinion regarding a CT arthrography and/or repeat surgery. (Tr. 234). Dr. Shields also presented Plaintiff with the option of leaving the shoulder alone and going to physical therapy to strengthen and regain his range of motion, but realizing that he may never return to his full duty work as a firefighter. (Tr. 234). Plaintiff responded that he would think about whether he would get repeat surgery or whether he could "live with it," realizing he might "be on full term disability with inability to do any heavy labor in the future." (Tr. 234).

One month later, on April 13, 2012, Plaintiff returned to Dr. Shields and reported slow progress in physical therapy and having some pain on top of his shoulder and over the lateral aspect of the shoulder. (Tr. 240). He had some discomfort in his scapular

while sleeping, some neck pain, continued paresthesias radiating to the ring and little fingers, but no elbow symptomatology. (Tr. 240). Results of the physical examination were similar to those from Plaintiff's prior visit. (*Compare* Tr. 241-42, *with* Tr. 233). Dr. Shields diagnosed rotator cuff tear. (Tr. 242). Dr. Shields stated that he would be glad to try another surgery but stated, "I cannot guarantee[] how much better I can make him than he presently is." (Tr. 242). Dr. Shields opined that Plaintiff was presently disabled from his normal work. (Tr. 242).

On June 21, 2012, Plaintiff visited Dr. Shields for his nine-month surgical follow-up. (Tr. 226-28). He made slow progress since the surgery, and the dysfunction was tearing the repair. (Tr. 226). Dr. Shields wrote that Plaintiff had ache or pain all the time and that he needs to retire. (Tr. 226). Plaintiff had sought a second opinion from Dr. Ostempowski, who reportedly told Plaintiff that he should leave the tendon rupture alone as he will have more damage trying to repair it. (Tr. 226). Dr. Ostempowski recommended not doing any further surgery because the surgery would be done for quality of life issues, not for Plaintiff to return to work. (Tr. 226). Active range of motion was 85 degrees full flexion with discomfort, 70 degrees abduction with discomfort, 20-25 degrees extension, and 60 degrees external rotation. (Tr. 228). He had 5-/5 strength on resistive internal rotation without any obvious pain. (Tr. 228). Dr. Shields again diagnosed a rotator cuff tear and his impression was that Plaintiff had some delay in his right shoulder secondary to a massive tear in the rotator cuff. (Tr. 228). While there was discussion of the possibility of a right shoulder prosthesis in the future, Dr. Shields stated, "I guess he will just live with it for the present time." (Tr. 228). Dr.

Shields noted that Plaintiff was permanently disabled from his right shoulder and that he could not do heavy labor in the future. (Tr. 228).

On July 20, 2012, Dr. Shields completed a primary physician's statement of disability for the New York State and Local Retirement System. (Tr. 324-25). Dr. Shields diagnosed Plaintiff with rotator cuff tear with constant pain and stated that Plaintiff had a delay in his right shoulder secondary to a massive tear in the rotator cuff. (Tr. 324). Plaintiff had surgery and physical therapy, and treatment was not expected to substantially improve function and employability. (Tr. 325). Plaintiff's prognosis was poor. (Tr. 325). Dr. Shields opined that Plaintiff was 100% disabled with no desk duty. (Tr. 325).

During a July 24, 2012, follow-up, Dr. Shields noted that Plaintiff's rotator cuff repair had "failed over time." (Tr. 235). Plaintiff reported to Dr. Shields that he had seen Dr. Ostempowski again, who continued to discourage repeat surgery and saying that he should "stay disabled as a fireman," and who thought that Plaintiff had made very little progress. (Tr. 235). Active range of motion was 85 degrees forward flexion, 75 degrees abduction, 15 degree extension, and 50 degrees external rotation. (Tr. 237). Dr. Shields stated that Plaintiff had persistent loss of motion and weakness after the rotator cuff tear and attempted repair. (Tr. 237). Dr. Shields noted that follow up would be in a month's time, but he felt that Plaintiff was permanently disabled. (Tr. 237).

Plaintiff was discharged from physical therapy on August 22, 2012, as it was no longer authorized by his insurance. (Tr. 225). Since September 9, 2011, Plaintiff had attended 111 physical therapy appointments. (See Tr. 219-22, 224-25, 239). The physical

therapist noted that over the past few months, Plaintiff had made minimal progress in terms of strength and range of motion.  (Tr. 225).  He had met only 2/4 short term goals, and 0/3 long term goals.  (Tr. 225).

On September 10, 2013, the New York State and Local Police and Fire Retirement System found that Plaintiff was "incapacitated for the performance of duties." (Tr. 326).

On September 28, 2012, Plaintiff was treated by Dr. Shields.  (Tr. 297).  There were many things Plaintiff could not do that required lifting or force with his right upper extremity.  (Tr. 297).  Dr. Shields noted there was no change in his progress over time. (Tr. 297).  Dr. Shields stated, "I feel he has a significant degree of disability, which is chronic and permanent. . . .  I would anticipate that he will be permanently disabled from his right shoulder." (Tr. 299).

Plaintiff underwent a consultative internal medicine examination by Dr. Nikita Dave, M.D., on October 3, 2012.  (Tr. 313-16).  Plaintiff reported that the surgery helped decrease the sharp, severe, intense pain by 60% but he continued to have a constant, achy pain in the posterior scapula, AC joint, and lateral shoulder, which was a four out of ten that day.  (Tr. 313).  Aggravating factors included sleeping, lying on the affected side, cleaning, activities of daily living, shopping, and yard work.  (Tr. 313).  He also complained of occasional tingling along the right ulnar forearm and hypothenar eminence.  (Tr. 313).  Plaintiff reported an axial low back pain for the past ten years. (Tr. 313).  It was aggravated by prolonged sitting, standing, bending, and lying down. (Tr. 313).  It improved with chiropractic treatment but that treatment was cut by insurance.  (Tr. 313).  He had no cervical spine complaints, imaging, or upper extremity

EMG. (Tr. 313). Plaintiff's activities of daily living included showering, bathing, dressing, watching TV, listening to the radio, and reading. (Tr. 314).

On examination of his musculoskeletal system, Dr. Dave noted that Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (Tr. 315). He had tenderness along his right cervical paraspinals and trapezii and infrascapular area. (Tr. 315). There was no kyphoscoliosis. (Tr. 315). Lumbar spine extension was to five degrees; flexion was 75 to 80 degrees; lateral flexion to 20 degrees; and rotation to 30 degrees. (Tr. 315). There was slight tenderness in the midline from L4 through S1. (Tr. 315). Straight leg raise test was negative. (Tr. 315). On examination of his right shoulder, there was no swelling but mild atrophy of the anterior shoulder border. (Tr. 315). Right shoulder forward flexion was to 85 degrees, abduction was 65-70 degrees, adduction to 20 degrees, internal rotation to 15 degrees, and external rotation was 20-25 degrees. (Tr. 315). There was no significant tenderness over the right shoulder other than slight tenderness posteriorly. (Tr. 315). He had full range of motion of both elbows, forearms, and wrists, bilaterally. (Tr. 315). Plaintiff's joints were stable with no redness, heat, swelling, or effusion. (Tr. 315). Deep tendon reflexes were normal and equal in both upper and lower extremities. (Tr. 315). He had full (5/5) strength in the upper and lower extremities except for slightly limited strength in his right shoulder (4+ to 5-/5), which was limited by pain and apprehension. (Tr. 315). Plaintiff's hand and finger dexterity was intact with full (5/5) grip strength and the ability to zip, button, and tie bilaterally. (Tr. 315).

In a medical source statement, Dr. Dave opined that Plaintiff had moderate to marked limitations for repetitive gross motor manipulation through the right shoulder, lifting, carrying, pushing, pulling of heavy objects, repetitive reaching upward, particularly outward.  (Tr. 316).  Plaintiff also had mild to moderate limitations for "prolonged sitting, standing, ROM through the lumbar spine." (Tr. 316).

On October 30, 2012, Plaintiff returned to Excelsior for his right shoulder pain where he was seen by physician's assistant Christine Ehrensberger.  (Tr. 328-30). Plaintiff reported stabbing, throbbing, and sore pain.  (Tr. 328).  It occurred constantly and was aggravated by activity, sitting, and standing.  (Tr. 328).  Plaintiff's strength was 3/5 with resisted ER, and 4/5 with resisted flexion and IR.  (Tr. 329).  Ms. Ehrensberger opined that Plaintiff had a significant permanent disability to the shoulder and would not be able to return to work as a fireman.  (Tr. 329).  She assessed that Plaintiff had 77.5% loss of use ("LOU") for: 40% loss of flexion defect, 10% loss of internal rotation defect, 7.5% loss for extension defect, 10% loss for distal clavicle excision, and 10% loss for rotator cuff tear.  (Tr. 329).  She noted that Plaintiff had reached maximum medical improvement.  (Tr. 329).

Dr. Shields wrote a letter on December 11, 2012, and opined that Plaintiff was "permanently disabled from duties as a fireman, with no desk duty." (Tr. 331).  During a January 11, 2013 follow-up with Dr. Shields, Plaintiff reported that he tweaked his shoulder when he slipped on ice and caught himself when he started to fall.  (Tr. 388). On examination, Dr. Shields noted that active range of motion of the shoulders was 70-75 degrees of forward flexion, 70 degrees of abduction, 15 degrees of extension, internal

-14-

rotation to the right hip pocket, and 45 degrees of external rotation.  (Tr. 389).  Dr. Shields opined that Plaintiff was permanently disabled as a firefighter.  (Tr. 389). Plaintiff was to return in four to six weeks as required by Workers' Compensation. (Tr. 389).  Plaintiff returned to Excelsior on February 19 and April 2, 2013, where he was seen by Ms. Ehrensberger.  (Tr. 384-87).  Plaintiff was required to visit the doctor monthly until his Workers' Compensation case was closed.  (Tr. 386).  Plaintiff was not able to reach shoulder height, and he complained of a constant shoulder ache.  (Tr. 386). His exam was virtually unchanged, and Plaintiff remained out of work.  (Tr. 387).  Ms. Ehrensberger opined that Plaintiff had a permanent total disability of his right shoulder and did not anticipate him being able to return to work as a fireman.  (Tr. 385).

## 2.    Medical Evidence Submitted to the Appeals Council

On June 3, 2014 and June 17, 2014, Plaintiff treated with Dr. William Capicotto for low back pain.  (Tr. 13; Tr. 21).  Pain radiated down the posterior aspect of Plaintiff's right leg and it was aggravated by prolonged sitting or standing, repetitive twisting, turning, lifting, bending, pushing, or pulling.  (Tr. 13).  It was noted that Plaintiff had undergone an MRI on his lumbar spine on June 7, 2014, which showed multilevel disc degeneration at L1-2, L2-3 and L3-4.  (Tr. 16).  At L3-4 there is a disc herniation with collapse and foraminal involvement both on the right and the left.  (Tr. 16).  It was noted that the condition was 100% causally related to Plaintiff's work accident occurring in May 2003, and that Plaintiff had moderate, permanent disability.  (Tr. 16).  Plaintiff was diagnosed with lumbar disc herniation with myelopathy.  (Tr. 17).

### D.    Chiropractic Treatment

On July 7, 2011, Plaintiff was treated by chiropractor Peter J. Guzinski, for low back pain.  (Tr. 333-34).  Plaintiff self-assessed his back pain as a three out of ten that day, but when the pain was at its worst, it was a ten out of ten.  (Tr. 333).  Plaintiff was unable to walk for more than one mile and sit or stand for more than one hour.  (Tr. 333). Dr. Guzinski opined that, based on the New York's Workers' Compensation Guidelines, Plaintiff had a mild disability.  (Tr. 333).  Plaintiff saw Dr. Guzinski for low back pain 26 times between August 9, 2011 and September 17, 2013.  (*See* Tr. 335-53).

On October 8, 2013, Plaintiff was reevaluated after exacerbating his work injury by falling on the ice in February 2013.  (Tr. 355).  Plaintiff described the pain as frequent, sharp and shooting.  (Tr. 355).  He was unable to sit for more than thirty minutes, unable to stand for more than thirty minutes and his sleep had been reduced by less than 50%, and he could not walk more than a quarter of a mile.  (Tr. 355).  Plaintiff was diagnosed with a lumbar strain, associated lumbar disc herniation, complicated by lumbar radiculitis, and lumbar somatic dysfunction.  (Tr. 356).  Upon examination, Plaintiff's lower extremity deep tendon reflexes were normal (2/2) and lower extremity muscle strength was full (5/5).  (Tr. 355).  On active range of motion testing of the lumbar region, Plaintiff's flexion was 60 degrees (normal is 60), extension was 20 degrees (normal is 25 degrees), left rotation was 20 degrees (normal is 30), and all other active lumbar ranges of motion were normal.  (Tr. 355).  Dr. Guzinski stated that Plaintiff continued to make slow but favorable progress.  (Tr. 355-56).  Based on Workers' Compensation  Guidelines, Dr. Guzinski felt that Plaintiff still had a mild disability

regarding his lower back. (Tr. 356). Plaintiff received additional chiropractic treatments on November 5 and December 3, 2013. (Tr. 357-60). Physical examination results were unchanged from those from October 8. (*Compare* Tr. 357, and 359, *with* Tr. 355).

## III.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y., Inc. v. NLRB,* 305 U.S. 197, 229 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim,

and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46-47 (2d Cir.1996).

Judgment on the pleadings may be granted under Fed. R. Civ. P. 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988).

## B.    Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin,* No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The burden is on the claimant to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir. 2002). The

individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### C.      Summary of ALJ's Determination

In applying the five-step sequential evaluation in this matter, ALJ McDougall made the following determinations.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 25, 2011, the alleged onset date.  (Tr. 40).  At step two, the ALJ determined that Plaintiff had severe impairments of surgical repair of right rotator cuff with sequelae of torn tendons and persistent pain, and low back pain.  (Tr. 40).  The ALJ concluded at step three that Plaintiff did not meet or equal any listed impairment.  (Tr. 41).  At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff:

> [H]as the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he needs to be able to alternate positions every half hour for a brief period of one or two minutes, no more than occasional gross motor movement of the right shoulder, no overhead reaching on right, no more than occasional use of right hand up to chest level, no reaching out front more than 18 inches on the right.

 (Tr. 42).  The ALJ also determined at step four that Plaintiff is assumed to be unable to perform his past relevant work.  (Tr. 44-45).  At step five, the ALJ ultimately concluded that Plaintiff was not disabled or entitled to disability insurance benefits.  (Tr. 45-46).

### D.      Plaintiff's Objections

#### 1.      The ALJ's Development of the Record

##### a)      Arguments

Plaintiff argues that the ALJ's failure to require medical records from the only doctor who prescribed Plaintiff pain medication and administered psychiatric treatment, Dr. Matala, resulted in determinations about the severity of Plaintiff's anxiety and

Plaintiff's credibility that were not supported by substantial evidence.  (Dkt. 9-1 at 15-17).  Specifically, Plaintiff argues that the ALJ's determination that Plaintiff's anxiety was non-severe was "wholly speculative" without any of Dr. Matala's medical records.  (Dkt. 9-1 at 17).  Likewise, in assessing the credibility of Plaintiff's allegation of constant pain, the ALJ stated: "The list of medications [Plaintiff] takes is short and does not look like it has been changed or adjusted."  (Tr. 44).  Plaintiff argues this statement and reasoning is unsubstantiated without Dr. Matala's medical records.  (Dkt. 9-1 at 17).

Defendant, on the other hand, argues that, while the ALJ does have a duty to develop the administrative record, that duty is not absolute in that it is Plaintiff's obligation to furnish medical evidence that establishes a disabling impairment.  (Dkt. 11-1 at 13).  According to Defendant, that the ALJ offered to keep the record open for additional incoming records satisfied the ALJ's duty to develop the record.  (Dkt. 11-1 at 14).  Finally, Defendant contends that Plaintiff's anxiety was not severe based on the evidence of record and points out that Plaintiff did not allege disability based on mental limitations.  (Dkt. 11-1 at 15-16).

### b)    Analysis

### (1)    Legal Standard

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record" even when Plaintiff is represented by counsel. *Perez*, 77 F.3d at 47.  This duty "includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source

-21-

is inadequate to determine whether the claimant is disabled," as well as "advising the plaintiff of the importance of such evidence." *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). The ALJ is compelled to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 103-104 (2000). The ALJ must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez*, 77 F.3d at 47 (quoting 20 C.F.R. § 404.1512(d)). An ALJ may issue subpoenas "to ensure not only the production of a claimant's medical records, but also to obtain the testimony of necessary witnesses." *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002) (citing 42 U.S.C. § 405(d)). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history', the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie v. Astrue*, 412 Fed. App'x 401, 406 (2d Cir. 2011) (citation omitted).

### (2)   Application

Plaintiff's argument that the ALJ failed to fill an obvious gap in the record with regard to Plaintiff's anxiety fails. Plaintiff did not specifically allege anxiety as an impairment. (*See* Tr. 191). Though his anxiety was discussed as his hearing, neither he nor his counsel alleged anxiety as an impairment at that time or in his brief to the Appeals Council. (*See* Tr. 50-87; Tr. 211-217).

While the Second Circuit has not addressed the issue of an ALJ's duty to develop the record with regard to impairments not alleged, a number of other Circuits have found that ALJs need not investigate disabilities not alleged during the application or hearing

-22-

phase of a social security disability proceeding without an obvious basis for doing so. The Eighth Circuit, for example, has stated that an ALJ "is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (quoting *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003)); *cf. Cunningham v. Apfel*, 222 F.3d 496, 501 n.6 (8th Cir. 2000) ("Here, in spite of testimony that should have alerted the ALJ to Cunningham's mental limitations, the ALJ did not pursue any questioning that could have revealed Cunningham's mental disabilities. Such "'[s]uperficial questioning of inarticulate claimants or claimants with limited education is likely to elicit responses which fail to portray accurately the extent of their limitations.'"") (citations omitted). The Fourth Circuit acknowledged and adopted this view as well. *See Meyer v. Astrue*, 754 F.3d 251, 256-57 (4th Cir. 2014) (holding, in the context of an attorney fee action, that the Commissioner did not unreasonably defend the ALJ's decision where the ALJ failed to address an issue that was not raised with specificity before the ALJ). Likewise, the Fifth Circuit has stated, "[t]he ALJ's duty to investigate, though, does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995). Finally, the Eleventh Circuit has held that, where the plaintiff argued that there were numerous suggestions in the record before the ALJ that she might function at a low cognitive level but did not allege a mental disability, the ALJ did not fail to develop the administrative record in not ordering a consultative

examination. *Hethcox v. Comm'r of Soc. Sec.*, 638 Fed. App'x. 833, 835 (11th Cir. 2015).

A number of New York District Courts have held similarly to the above Circuit courts. For example, in *Oaks v. Colvin*, No. 13-CV-917-JTC, 2014 WL 5782486 (W.D.N.Y. Nov. 6, 2014), the plaintiff argued that the ALJ failed to recognize an obvious gap in the evidentiary record regarding the plaintiff's cognitive functioning. *Id.* at *9. There, the court found that this failure could not "be deemed reversible error, given that plaintiff did not specifically allege impairment of cognitive functioning as a disabling condition in his application for benefits . . . at his hearing . . . or in his brief to the Appeals Council" and no medical source found plaintiff's cognitive functioning to be a significant factor in relation to his ability to perform basic work functions. *Id.* In *Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487 (S.D.N.Y. 2013), the court found that there was substantial evidence supporting the ALJ's decision that the claimant's depression was not severe where claimant had not alleged a psychiatric impairment, had no history of mental health treatment, could perform daily activities, had good relationships with his family, a state agency psychologist opined that the claimant's mental impairments were not severe, and claimant testified his mental capacities were intact. *Id.* at 498-99.

Here, neither Plaintiff nor his counsel alleged anxiety, or any mental impairment, in his initial disability application. (*See* Tr. 191). And neither alleged anxiety during the hearing or during the Appeals Council appeal. (*See* Tr. 50-87; Tr. 211-217). Plaintiff also testified as to having no prior psychiatric treatment or panic attacks. (Tr. 69). In addition, the ALJ asked at the hearing whether there was any medical evidence that was

not in the record. (Tr. 55). Plaintiff's attorney noted that they were waiting on chiropractic records and the ALJ offered to keep the record open. (Tr. 55). It appears it did not occur to Plaintiff's counsel to add Dr. Matala's medical evidence to the record until recently, on appeal to this Court, despite the bountiful opportunities to enter that evidence during the administrative stages. That Plaintiff ultimately bears the burden in proving a disability coupled with the case law suggesting that an ALJ's duty to develop the record does not extend to situations like this, where a disability was neither alleged nor was there substantial evidence of the claimed disability in the record, leads to the conclusion that the ALJ here did not err by not obtaining Dr. Matala's records in relation to Plaintiff's anxiety.

Plaintiff asserts a second reason for which not obtaining Dr. Matala's records was in error—the fact that Dr. Matala was the only physician who prescribed medication to Plaintiff. (Dkt. 9-1 at 16-17). This argument is made both in relation to the ALJ's duty to develop the record and the ALJ's credibility determination. The former will be discussed now and the latter will be discussed in the section on credibility. (*See* Part III.D.4 of this Decision and Order). It is well-established that the ALJ has "no obligation to obtain duplicative evidence." *Pagan v. Astrue*, No. 5:11-cv-825, 2012 WL 2206886, at *8 (N.D.N.Y. June 14, 2012). Aside from the anxiety medication, which, as explained above, goes to an alleged impairment that was never raised and is legally irrelevant, Dr. Matala's medical evidence of Plaintiff's two other medications, ibuprofen and hydrocodone, would have been largely duplicative of the information contained in treating specialist Dr. Shields' medical records. Dr. Shields' records indicate that

Plaintiff was taking ibuprofen and Lortab, a brand of hydrocodone, as of July 21, 2011. (Tr. 250; Tr. 303).   On September 23, 2011, two days after Plaintiff's shoulder surgery, the record notes that Plaintiff "has pain meds." (Tr. 249; Tr. 296).   While the September 23 entry is a bit vague, a December 2, 2011 entry clears it up, noting that Plaintiff is on ibuprofen, but that Plaintiff "reports there is no need for any Lortab." (Tr. 262; Tr. 279). On March 15, 2012 the record notes that Plaintiff had been taking ibuprofen, but that "[h]e is no longer on his Lortab." (Tr. 234).   On September 28, 2012, Plaintiff's treatment plan included "continu[ing] with the ibuprofen." (Tr. 299).   On October 3, 2012, Plaintiff's "current medications" were recorded as Motrin, a brand of ibuprofen. (Tr. 314).   Similarly, on October 30, 2012, December 11, 2012, January 11, 2013, February 19, 2013, and April 2, 2013, Plaintiff was noted to have been on ibuprofen. (Tr. 328; Tr. 392; Tr. 388; Tr. 384; Tr. 386).   The rest of the entries for Plaintiff's various visits to Dr. Shields indicate that someone went over Plaintiff's medication list for accuracy all but one time. (Tr; 282; Tr. 241; Tr. 275; Tr. 227; Tr. 291).   While these records may not paint an exact picture of precisely when certain medications were prescribed, they certainly are enough such that there was no obvious gap regarding Plaintiff's medications requiring the ALJ to pursue medical records from Dr. Matala.

### 2.      The ALJ's Duty to Recontact Plaintiff's Treating Specialist

#### a)      Arguments

Plaintiff argues that the ALJ's evinced confusion during the hearing as to Dr. Shields' reasoning behind finding Plaintiff disabled not only from his duties as a fireman but also from desk duty should have compelled the ALJ to recontact Dr. Shields for

clarification.  (Dkt. 9-1 at 17-20).  Plaintiff further submits that the ALJ's failure to provide a reason as to why he afforded the opinion of Dr. Shields, Plaintiff's treating specialist, "significant but not controlling weight," was in error and leaves only the inference that Dr. Shields' opinion "just [did not] follow," which is not a  good reason and warrants remand.  (Tr. 44; Dkt. 9-1 at 20-21).

Defendant counters that Plaintiff's characterizations of Dr. Shields' statements about Plaintiff being completely disabled are misplaced; rather, Defendant argues that Dr. Shields opined that Plaintiff was disabled from his work as a firefighter[1] in relation to a Workers' Compensation claim, which is not binding on the Social Security Administration (the "SSA").  (Dkt. 11-1 at 16-17).  Additionally, Defendant highlights the fact that the regulations had been amended at the time of the ALJ's decision such that they no longer require an ALJ to recontact a treating source, allowing for more flexibility in "determining when and how to obtain information from medical sources to resolve an inconsistency or insufficiency in the evidence."  (Dkt. 11-1 at 17-18 n.3).  This rule paired with a lack of insufficiency in the medical record, according to Defendant, left the ALJ with no obligation to recontact Dr. Shields.  Finally, because the ALJ explained his reasoning for giving Dr. Shields' opinion significant but not controlling weight—namely, that Dr. Shields based his determination of disability on the New York Workers' Compensation  guidelines which are not binding on the SSA—Defendant submits that there was no error.  (Dkt. 11-1 at 18-19).

---

[1]      Plaintiff replies that Dr. Shields' variation in the record between stating Plaintiff was disabled from being a firefighter and being disabled entirely is an inconsistency in the record that also necessitated recontact.  (Dkt. 12 at 3-4).

### b)   Analysis

### (1)   Legal Standard

"It is well established in this Circuit that 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" *Jennings v. Colvin*, No. 13-CV-834, 2014 WL 3748574, at *5 (W.D.N.Y. July 29, 2014) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)) (citation omitted).  Further, an ALJ is only required to recontact "if the records received were 'inadequate . . . to determine whether [Plaintiff was] disabled." *Brogan-Dawley v. Astrue*, 484 Fed. App'x. 632, 634 (2d Cir. 2012).  As explained by the Second Circuit:

> The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician. Rather . . . the ALJ will weigh all of the evidence and see whether [he] can decide whether a claimant is disabled based on the evidence he has, even if that evidence is internally inconsistent.

*Micheli v. Astrue*, 501 Fed. App'x 26, 29-30 (2d Cir. 2012); *see also* 20 C.F.R. § 404.1520b(b) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have.").

Additionally, Defendant rightly highlights that the regulations in place at the time the ALJ made his decision in February 2012 no longer contain the previous directive to first recontact a medical source upon finding a conflict or ambiguity in need of

resolving.[2]   In its notice of final rule, the Social Security Administrative explained that

the removal of the subsection was because:

> Depending on the nature of the inconsistency or insufficiency, there may be other, more appropriate sources from whom we could obtain the information we need.   By giving adjudicators more flexibility in determining how best to obtain this information . . . we will be able to make a determination . . . more quickly and efficiently in certain situations.

How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,655 (Feb.

23, 2012) (codified at 20 C.F.R. § 404.1512).

Lastly, "[i]f [an ALJ finds] that a treating source's opinion on the issue(s) of the

nature and severity of [the plaintiff's] impairment(s) is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the plaintiff's] case record, [the ALJ] will give it

controlling weight."   20 C.F.R. § 404.1527(c)(2).   When an ALJ does not afford a

treating source's opinion controlling weight, he or she will "apply the factors listed in

paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs

(c)(3) through (c)(6) of this section in determining the weight to give the opinion." *Id.*

---

[2]     The regulations were revised, effective March 26, 2012, to wholesale remove the provision stating:

> We will first recontact your physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. § 404.1512(e) (before amendment).

The factor pertinent to this case is found in subsection (c)(6): "[W]e will also consider any factors . . . which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has . . . [is a] relevant factor[] that we will consider in deciding the weight to give to a medical opinion."  20 C.F.R. § 404.1527(c)(6).  An ALJ "will always give good reasons in [his or her] notice of determination or decision for the weight [he or she gives the plaintiff's] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  In addition, a determination by "any other governmental agency about whether [a plaintiff is] disabled . . . is based on its rules and is not [the SSA's] decision about whether [a plaintiff is] disabled. . . .  [The SSA] must make a disability . . . determination based on social security law" and "a determination made by another agency that [a plaintiff] is disabled . . . is not binding on [the SSA]."  20 C.F.R. § 404.1504.

### (2)   Application

The Court finds no gap in the record as to Dr. Shields' opinion regarding desk duty.  Dr. Shields' medical records from February 2, 2012, explain the reasoning behind his assessment of Plaintiff as disabled with no desk duty: "[Plaintiff] feels he cannot do desk work because of the pain he has gotten in his shoulder blade.  Even sitting is uncomfortable for him.  We are going to keep him out of work for the present time."  (Tr. 283).  Thus, the record was not incomplete or insufficient such that the ALJ could not make a determination based on the information contained therein.  Indeed, if the ALJ resolved his so-called confusion from the hearing based on the record, he was in

compliance with the new regulations that allow for the resolving of inconsistencies through the most appropriate and efficient source. In this case, that source was the record itself.

Additionally, the main statement in question here is a treating physician's assessment of overall disability—not an assessment of the quantitative or qualitative nature of Plaintiff's impairments. "[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are 'reserved to the Commissioner.' . . . A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. §§ 404.1527(d)(2), 404.1527(d)(4), 404.1527(e)(1)); *see also Micheli*, 501 Fed. App'x at 28 ("As an initial matter, [the doctor's] assessments of [the plaintiff's] 'disability status' are not determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant has a 'disability' under the statute."). It is, rather, the treating source's opinion on "the nature and severity of . . . impairments" that will be given controlling weight if well-supported. 20 C.F.R. § 404.1527(d)(2). Dr. Shields' statements read: "Pt is 100% disabled-No Desk duty" (Tr. 325), and "[Plaintiff] is permanently disabled from duties as a fireman, with no desk duty." (Tr. 331). As those are opinions of overall disability, and not medical evidence or quantitative or qualitative information about the impairment, the ALJ was entitled to "consider[] the data that [Dr. Shields] provide[d] but draw[] [his] own conclusion as to whether those data indicate[d] disability." *Snell*, 177 F.3d at 133. Plaintiff's additional point raised in his reply papers about Dr. Shields' vacillation between opining that

Plaintiff was disabled from his job as a firefighter and opining that he was totally disabled fails for the same reasons.  The Court finds that the ALJ had no duty to recontact Dr. Shields on these facts.

Finally, the Court finds that the ALJ fulfilled the requirement of giving good reasons in his notice for affording Dr. Shields' opinion only significant weight rather than controlling weight.  The ALJ stated that Dr. Shields' evidence of treatment was "excellent and detailed and it establishes that he is permanently disabled for his job as a firefighter" and that the New York Workers' Compensation recognized as much.  (Tr. 44).  However, he goes on to explain that a determination of legal disability for the purpose of the SSA must be made in accordance with the SSA's own rules, regulations, and guidelines.  (Tr. 44).  The consideration of a source's "understanding of [the SSA's] disability programs and their evidentiary requirements" is proper in according weight given to medical opinions.   20 C.F.R.  § 404.1527(c)(6).   Additionally, a disability determination under the Workers' Compensation Guidelines are not binding on an ALJ. *See* 20 C.F.R. § 404.1504.  Thus, it was appropriate for the ALJ to afford substantial, but not controlling, weight to Dr. Shields' opinion regarding disability because Dr. Shields' opinion was in relation to Workers' Compensation, a separate, state agency.  (Tr. 329).[3]

---

[3]       Dr. Shields' notes read: "He has a significant permanent disability to the shoulder and will not be able to return to work as a fireman. . . . According to the New York State Workers' Compensation Guidelines January 2012, this patient has a *77.5% scheduled loss of use of *the right shoulder*.  The contents of this report are true and correct to the best of my knowledge according to the State of New York Workers' Compensation Board Medical Guidelines January 2012."  (Tr. 329).

### 3.      The ALJ's RFC Finding

#### a)      Arguments

Plaintiff suggests that the ALJ's RFC assessment deviates from the medical opinions of record with no explanation as to why. (Dkt. 9-1 at 21-22). The consultative examiner, Dr. Dave, found "moderate to marked limitations for . . . lifting [and] carrying." (Tr. 316). Plaintiff also stated that lifting a gallon of milk caused him pain in his right arm and that his left arm was becoming painful from overuse. (Tr. 64-65; Dkt. 9-1 at 23). Because a finding of light work inherently includes the capability of lifting 20 pounds with frequent lifting and carrying of 10 pounds, Plaintiff argues that this finding is in error. (Tr. 9-1 at 22-23). Further, according to Plaintiff, the ALJ's "highly specific RFC" is based on the ALJ's own layperson surmise and not on the record. (Dkt. 9-1 at 23). Plaintiff points to the findings that Plaintiff's limitation with prolonged standing or sitting would be mitigated by alternating positions every half hour for one to two minutes and that Plaintiff's limitation in reaching outward would be mitigated by not reaching more than 18 inches as examples of findings with no medical support in the record that are inconsistent with Plaintiff's own testimony. (Dkt. 9-1 at 23-24).

Defendant counters that the ALJ did not find that Plaintiff could do all light work; instead, he found significant limitations to even light work with regard to Plaintiff's right arm and shoulder. (Dkt. 11-1 at 19-20). Additionally, Defendant argues that there is no requirement for an RFC to directly mirror a medical opinion, as the ultimate responsibility for RFC determination lies with the ALJ who must, and did, make an RFC finding consistent with the record as a whole. (Dkt. 11-1 at 20-21).

### b)    Analysis

#### (1)    Legal Standard

As laid out above, 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record.    Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y., Inc. v. NLRB*, 305 U.S. 197, 229 (1938).    While the "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion," *Rosa*, 168 F.3d at 79, "the ALJ's RFC finding need not track any one medical opinion." *O'Neil v. Colvin*, No. 13-cv-575-JTC, 2014 WL 5500662, at *6 (W.D.N.Y. Oct. 30, 2014). "Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence.    The trier of fact has the duty to resolve that conflict.")).

#### (2)    Application

As a preliminary matter, the Court agrees with Defendant that the ALJ did  not simply find that Plaintiff could do light work, which would entail lifting 20 pounds at most and 10 pounds occasionally.    The RFC was significantly limited for the right arm (Tr. 42) in accordance with Dr. Dave's finding, not in direct conflict with it.    In relation to lifting and carrying specifically, Plaintiff could do his occasional lifting with his left

arm which, though beginning to hurt from overuse (Tr. 64-65), is not injured and use of which would not be required frequently.

Plaintiff tends to acknowledge these extensive limitations in claiming that there is "no evidence of record, medical or testimonial, to support these *inventive* limitations," referring to the sitting, standing, changing position, and reaching limitations. (Dkt. 12 at 6) (emphasis in original). The Court partially agrees with Plaintiff that the RFC lacks a substantial evidentiary foundation—specifically in regard to the one to two minute period during which Plaintiff is to change position.

Plaintiff relies heavily on *Cosnyka v. Colvin*, 576 Fed. App'x 43 (2d Cir. 2014), where the Second Circuit remanded because the ALJ's finding of a limitation such that the plaintiff could take "comfort breaks" for six minutes rather than some other amount of time every hour was based on the ALJ's "own surmise" and not on the record. *Id.* at 46. In that case too, the vocational expert's opinion as to available jobs was based on a hypothetical involving the very limitation that was not substantiated. Thus, "it [was] unclear as to the length of individual breaks [the plaintiff] would need, and it [was] unclear as to the availability of jobs that could accommodate whatever breaks he needed." *Id.* at 46. Plaintiff here argues that the limitations of alternating positions every half hour for one to two minutes and reaching out front no more than 18 inches on the right are similarly based on the ALJ's own surmise and not the record. (Dkt. 9-1 at 22-24).

In *Kirkland v. Colvin*, No. 15-CV-6002P, 2016 WL 850909 (W.D.N.Y. May 4, 2016), the court encountered a similar argument as that made here with a similar reliance

on *Cosnyka*: that "because each limitation assessed by the ALJ does not precisely correspond to a medical opinion in the record, remand is warranted." *Id.* at *12.   The court in *Kirkland* distinguished the two cases, noting that in *Cosnyka*, the ALJ interpreted the examiner's opinion that the plaintiff would require "regular comfort breaks" as requiring a six-minute break each hour when nothing in the record or testimony supported that conclusion, but that in *Kirkland*, the RFC was supported by the plaintiff's daily activities, sporadic and conservative treatment, and by the state examiner's evaluation. *Id.*

Just as the court in *Kirkland* found that the ALJ's RFC was supported by the record as a whole, the Court finds the same here as to Plaintiff's ability to sit and stand for a half hour.   There are numerous references in the record to Plaintiff's injury being aggravated by "prolonged sitting."   (*See, e.g.,* Tr. 316).   However, the ALJ's interpretation of "prolonged" as amounting to a half hour is not unsupported in the record.   Indeed, Plaintiff testified that he could sit for about 15 to 20 minutes before he would need to get up and move. (Tr. 66).   Elsewhere, the transcript stated that Plaintiff could not sit for more than one hour.   (Tr. 333).   Finally, the transcript also said that plaintiff was unable to sit for more than 30 minutes as of October 2013.   (Tr. 355). Likewise, the record varied between Plaintiff's ability to stand between 10 minutes, one hour, and 30 minutes. (Tr. 66; Tr. 333; Tr. 355).   Based on those variations, the ALJ appears to have chosen a timeframe conservatively between 15 to 20 minutes and one hour for sitting and 10 minutes to one hour for standing.   The Court concludes that this portion of the RFC determination was based on substantial evidence.

However, the Court is not able to so conclude about the portion of the RFC referring to changing position for "brief period[s] of one or two minutes." (Tr. 42). The only possible evidence of this limitation comes from small talk at the oral hearing—not even the testimony itself—in which Plaintiff requests to stand up "just to stretch." (Tr. 66). Aside from this, as in *Cosnyka*, the Court cannot find, nor has Defendant pointed to, anything in the record or testimony to support that one to two minutes as opposed to some other amount of time is appropriate for this Plaintiff. *See, e.g., Vinson v. Colvin*, No. 6:15-cv-06006(MAT), 2015 WL 8482783, at *4 (W.D.N.Y. Dec. 9, 2015) (finding that an RFC of sitting for 1-2 minutes after standing for 15 minutes, and standing 1-2 minutes after sitting for 30 minutes was supported neither by medical nor testimonial evidence and thus was unsupported by substantial evidence); *Alberalla v. Colvin*, No. 13-CV-881-RJA, 2014 WL 4199689, at *11 (W.D.N.Y. Aug. 22, 2014) ("That being said, [the ALJ's] residual functional capacity assessment constitutes legal error, requiring remand, not only because the ALJ fails to cite any medical source or other evidence supporting the assertion that [the plaintiff] can sit for eight hours, but because no such evidence exists in the administrative record."). The quick back-and-forth between Plaintiff and the ALJ at the oral hearing does not amount to substantial evidence and thus cannot be the basis for affirming the RFC. The vocational expert's opinion becomes compromised by this as well, since he based his opinion on the hypothetical situation where, in part, "the person would have to be able to change position from sitting to standing or vice versa for a brief period, at least every half hour." (Tr. 77). In light of this, the Court must remand for further administrative proceedings.

Finally, it is unclear to the Court what exactly "reaching out front more than 18 inches on the right" means. (Tr. 42). One interpretation is that Plaintiff cannot reach more than 18 inches between a resting arm position and a raised arm position. If this is the case, the ALJ may have based the limitation on the portion of the record that states: "[Plaintiff] is a firefighter and has not been able to reach shoulder height since the surgery." (Tr. 386). As Plaintiff is a 6-foot tall man (Tr. 191), 18 inches is a conservative estimate of his shoulder height from a resting position. However, it is far from clear that this is the evidence on which the ALJ relied or that the above interpretation of "reaching out front more than 18 inches" is indeed accurate. Rather than engage in speculation, the Court finds here too that this portion of the RFC was not supported by substantial evidence in the record.

### 4.    The ALJ's Credibility Determination

#### a)    Arguments

Plaintiff argues that the ALJ incorrectly assessed Plaintiff's credibility. Specifically, Plaintiff asserts that the ALJ diminished Plaintiff's subjective complaints based on improper factors. Namely, Plaintiff takes issue with the ALJ's considering Plaintiff's pain subsidence by 30-40% post-surgery, plaintiff's discontinuance of physical therapy, and Plaintiff's short, generally unchanged medication list. (Dkt. 9-1 at 24-26). Conversely, Plaintiff names factors that the ALJ should have considered in his credibility assessment, but allegedly erroneously did not. (Dkt. 9-1 at 27). Those factors include Plaintiff's commitment to his treatment and his work history. (Dkt. 9-1 at 27). Finally,

Plaintiff contends that use of the Medical Vocational Guidelines should have compelled a finding of disability.  (Dkt. 9-1 at 27-28).

In response, Defendant points to objective medical evidence on which the ALJ correctly relied as undermining Plaintiff's subjective complaints, including factors such as Plaintiff's treatment, improvement, and medications.  (Dkt. 11-1 at 22-24).  Defendant combats the idea the ALJ had to consider Plaintiff's work history, as it is just one of many factors an ALJ may consider.  (Dkt. 11-1 at 24).  Finally, Defendants remind the Court that credibility assessments are to be given significant deference.  (Dkt. 11-1 at 25).

### b)   Analysis

#### (1)   Legal Standard

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence.  *Brownell v. Comm'r of Soc. Sec.,* No. 1:05-CV-0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009).  First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged. . . ."  20 C.F.R. § 404.1529(a).  Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. § 404.1529(b).

When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements

considering the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, in considering Plaintiff's credibility, the ALJ properly applied the two step analysis.  First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms.  (Tr. 43).  Second, the ALJ considered the evidence that Plaintiff's condition had subjectively, significantly improved after surgery.  (Tr. 43).  The ALJ also considered the fact that claimant had discontinued physical therapy and that his medication  list was neither long nor adjusted.  (Tr. 44).  In light of these statements, the ALJ found that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of [his] symptoms" were "not entirely credible."  (Tr. 43).

"It is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." *Aponte v. Sec'y, Dep't Health and Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) (quoting *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1982)). "The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and activities during the relevant

-40-

period." *F.S. v. Astrue*, No. 1:10-CV-444 (MAD), 2012 WL 514944, at *20 (N.D.N.Y. Feb. 15, 2012). If the ALJ does find that a claimant's testimony is not credible, then the ALJ's determination must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).

### (2)   Application

It appears that the ALJ properly considered Plaintiff's statements in light of the required factors and made a determination that Plaintiff's testimony was not entirely credible in light of the evidence. (Tr. 43-44). As explained above, the ALJ did not err by not requiring the medical records of Dr. Matala and had adequately developed the record with respect to Plaintiff's medications. (*See* Part III.D.1 of this Decision and Order). Thus, he did not err in considering the medications in relation to credibility. Similarly, though Plaintiff's physical therapy was dropped by insurance, the ALJ is able to consider "other treatment received to relieve symptoms," and considered physical therapy as one among a variety of treatments, including medication. (Tr. 43-44). As to the argument that Plaintiff's work history should have been explicitly considered, work history is "just one of many factors" an ALJ must consider. *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998); see *Wavercak v. Astrue*, 420 Fed. App'x 91, 94 (2d Cir. 2011) ("That Wavercak's good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination."). Further, as required, the ALJ specifically noted the evidence

reviewed to support that finding.  (Tr. 43-44).  Accordingly, the Court finds that the ALJ did not commit a legal error in evaluating Plaintiff's credibility.

Lastly, the Court addresses Plaintiff's submission that under the Medical-Vocational grids, Plaintiff would be disabled.  (Dkt. 9-1 at 27-28).  The ALJ correctly noted in his decision that, because the RFC does not provide for Plaintiff performing substantially all of the requirements of light work, the Medical-Vocational guidelines are used as a framework, and not as a directive.  *See* 20 C.F.R. § 404.1569.  However, even if the guidelines were directives, Plaintiff has incorrectly assessed his age at the time of the ALJ's decision (52) as "advanced age" (55+), 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(d), rather than "approaching advanced age" (50-54), 20 C.F.R. §  Pt. 404, Subpt. P, App. 2 § 201.00(g), in asserting that he falls under the Medical-Vocational Rule 202.06, which considers a person of advanced age.  20 C.F.R. Pt. 404, Subpt. P, App. 2. Indeed, the correct Medical-Vocational Rule is 202.14, which directs a finding of not disabled.  *Id.*  The ALJ did not stop there, though, as Plaintiff's RFC did not allow for full capacity light range work.  The ALJ solicited the testimony of a vocational expert who testified as to specific jobs that Plaintiff could perform despite the additional limitations to light work.  (Tr. 74-87).  As discussed above (*see* Part III.D.3 of this Decision and Order), the vocational expert's testimony was compromised by a hypothetical RFC not supported by substantial evidence; however, for the purposes of this Medical-Vocational grids argument, the ALJ did not commit legal error.

## IV.   Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 9) is granted, in part, and the Commissioner's motion for judgment on the pleadings (Dkt. 11) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 10, 2016
       Rochester, New York

-43-